**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
**- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X**
**JOSHUA GUSTAFSON,**

<b>Plaintiff,</b>

<b>-against-</b>

**ALVIN AILEY DANCE FOUNDATION, INC.,**

<b>Defendant.</b>

**- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X**

**COMPLAINT**

**Civ No.**

**PLAINTIFF DEMANDS**
**A TRIAL BY JURY**

Plaintiff, by his attorneys, GIORDANO LAW OFFICES, PLLC, complaining of Defendant, respectfully alleges:

<u>**PRELIMINARY STATEMENT**</u>

1.      This is a case about flagrant corporate greed, ongoing misclassification of employment, failure to pay federally and New York State mandated overtime wages, and whistleblower retaliation, as well as unlawful retaliation for advocating for union protection as indicated in a separate filing with the National Labor Relations Board ("NLRB").

2.      Plaintiff JOSHUA GUSTAFSON (hereinafter, "Plaintiff" or "GUSTAFSON"), brings this action against ALVIN AILEY DANCE FOUNDATION, INC. ("Defendant," "AILEY," or "the Company") for systemic wage-and-hour claims, unlawful misclassification of Plaintiff as an exempt employee; failure to pay overtime, failure to provide required wage notices and furnish accurate wage statements; and retaliatory termination of Plaintiff after he engaged in protected whistleblowing and safety reporting.

3.      From September 2021 through September 2025, while serving as Production Stage

Manager for AILEY's second company, Ailey II,[1] Plaintiff regularly worked far in excess of 40 hours per week without receiving the overtime pay mandated by the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq*., and New York Labor Law ("NYLL") § 650, *et seq*.; New York Codes, Rules, and Regulations § 142-2.2 .

4.    AILEY also failed to comply with wage-notice and record-keeping requirements under NYLL §§ 195(1) and (3).

5.    Plaintiff seeks to vindicate his rights under the FLSA, the NYLL, and New York's Whistleblower Law (NYLL § 740) and to recover all remedies authorized by law, including unpaid wages, liquidated damages, reinstatement or front pay, back pay, punitive damages, attorneys' fees, and costs

6.    Plaintiff was a dedicated and well-loved New York employee of Defendant AILEY, the New York dance theater Company, who was fired after he disclosed mounting conditions that posed a substantial and specific danger to public health and safety during Ailey II's 2025 Caribbean tour. Upon his return to New York from the tour, Defendant fired Plaintiff in retaliation for protected whistleblowing. As further pleaded herein, New York's Whistleblower Law, Labor Law § 740 (as expanded, effective Jan. 26, 2022), prohibits this retaliation and provides robust remedies, including reinstatement or front pay, back pay, attorneys' fees, civil penalty, and punitive damages for willful violations.

7.    In firing Plaintiff, AILEY also violated its own highly specific internal rules, which employees were contractually required to follow and which guaranteed broad protection of AILEY

---

[1] ALVIN AILEY DANCE FOUNDATION, INC. is an umbrella organization that supports the activities of Alvin Ailey American Dance Theater, Ailey I (the "first" company), The Ailey School, Ailey Arts in Education & Community Programs, and the Ailey Extension. Ailey II is the junior (i.e., "second") company of Alvin Ailey American Dance Theater, which bridges The Ailey School and the "first" company, Alvin Ailey Dance Theater. GUSTAFSON was hired as the Production Stage Manager for Ailey II.

employees against Company retaliation for whistleblowing.

8.    Plaintiff maintained a consistently high performance and clean record throughout his tenure with the Company, leading up to AILEY's abrupt termination following Plaintiff's report of serious workplace safety hazards along with his advocating for union protections.

9.    On August 29, 2025, Plaintiff observed and escalated multiple unsafe conditions at a Kingston, Jamaica venue that posed substantial and specific dangers to AILEY's dancers, crew and the public. Plaintiff attempted to address these concerns with supervisory staff throughout that day and escalated his concerns to additional AILEY supervisory staff located in New York, NY, the next morning, August 30, 2025.

10.    Plaintiff repeatedly disclosed to supervisors AILEY's activities, circumstances, and practices that he reasonably believed were in violation of local laws, rules, or regulations and posed a substantial and specific danger to public health or safety.

11.    Defendant, through the actions and inactions of its employees and agents, suppressed the dangers, put the dancers, crew, and public at grave risk of physical harm, and proceeded with the performances, though Plaintiff continued to escalate his reporting of the dangers within the Company.

12.    As the Production Stage Manager for Ailey II, Plaintiff was responsible for the safety of dancers, crew, and public audience members. As such, he was unable to green-light the Kingston, Jamaica performances, given several dangers he brought to AILEY's upper-level management and his supervisors' attention. Though Plaintiff went to great lengths, putting himself in harm's way, attempting to remedy the safety hazards so the performances could proceed safely, the dangers were beyond timely remediation.

13.    Therefore, in accordance with safety protocols, written Company policies and his

employment responsibilities, Plaintiff was required to escalate his observations and concerns by alerting AILEY management and directors in New York, refuse to participate in the efforts to continue the performances despite the dangers, stop the performances from going forward at the theater, and insist that the performances either be moved to a safe venue or cancelled.

14.     Instead of heeding Plaintiff's well-founded and shared concerns, Defendant's managers, supervisors, and corporate officers ignored and suppressed those concerns, and in retaliation for his escalating those concerns and refusing to be complicit in exposing the dancers, staff, and public to danger, Defendant terminated Plaintiff from employment upon his return to New York.

15.     The Company's purported reasons for Plaintiff's discharge were pretextual. The close temporal proximity between Plaintiff's protected activity and his termination demonstrates unlawful retaliation in violation of NYLL § 740 (2) and (5), which prohibit and remedy retaliatory action against employees who disclose or object to unsafe or unlawful practices, with extraterritorial application in such circumstances when a New York employee is terminated and suffers consequential damages for reporting such safety concerns for out-of-state Company business.

16.     Defendant's actions also implicate Section 7 of the National Labor Relations Act, 29 U.S.C. § 157, including 29 U.S.C. § 158(a)(1), which protects employees who engage in concerted activity - including advocating for union protection - and 29 U.S.C. § 158(a)(3), which prohibits discharge or discrimination for the purpose of discouraging such activity. Plaintiff therefore shall seek full relief under both state and federal law through the separately filed NLRB charge for these violations.

## STATEMENT OF MATERIAL FACTS

### Plaintiff's Background and Onboarding at AILEY

17.    Plaintiff is originally from Louisville, Kentucky. He received his Bachelor of Fine Arts *summa cum laude* in Theater Design & Technology (Stage Management) from Western Kentucky University in 2013.

18.    Plaintiff proved himself to be a man for all seasons early on and held several prestigious positions prior to being recruited by AILEY, including as a Stage Manager with the Kentucky Shakespeare Festival, Derby Dinner Playhouse, the Louisville Ballet, Actors Theatre of Louisville (Louisville, Kentucky), and as a Stage Manager with Goodspeed Musicals (East Haddam, Connecticut), where he helped oversee the creation of over ten world premiere plays and musicals, including *Irving Berlin's Holiday Inn*, *Chasing Rainbows*, *My Paris*, *The Theory of Relativity*, *Wellesley Girl*, and *The Grown-Up*.

19.    After moving to New York City in 2016, Plaintiff immersed himself in theatrical production and held many positions, including work on the then off-Broadway *The Band's Visit* at the Atlantic Theater Company. Shortly thereafter, he joined Barrow Street Theatre's immersive *Sweeney Todd*, set in a functional pie shop with meat pies by White House pastry chef Bill Yosses.

20.    In 2018, Plaintiff left the pie shop when *The Band's Visit* transferred to Broadway, which ultimately won ten Tony awards, including Best Musical. Plaintiff worked with Roundabout Theatre Company & Lincoln Center Theater on three more world premiere plays (*Amy and the Orphans*, *Plot Points in Our Sexual Development*, and *The Headlands*) before joining the company of *Hadestown*, which ultimately won eight Tony awards, also including Best Musical.

21.    In 2019, Plaintiff subbed for Manhattan Theatre Club, New World Stages (*The Play That Goes Wrong*) and the national tour of *On Your Feet!* before returning to Broadway for the

epic two-part play *The Inheritance*, which ultimately won four Tony awards, including Best Play.

22.     GUSTAFSON proved himself worthy of the name Joshua and earned a reputation as a consummate professional who consistently cared for the safety and well-being of the AILEY dancers and his coworkers and brought unimpeachable integrity and ethics, loyalty, inclusivity, and hard work to his work as a stage manager. As quoted in the publication Backstage (July 31, 2018), GUSTAFSON shared one piece of advice emblematic of his professional philosophy, "I appreciate the actors who treat the ushers with the same respect and reverence that they treat their director; [it's] the ability to see the big picture, to see how many people it takes to create this transcendent experience we live for. Ultimately, that humility, grace, and kindness is everything and I feel it makes actors shine on and off the stage."

23.     With that foundation, GUSTAFSON turned his attention to an opportunity to work as a production stage manager for AILEY, for which he was well-suited, when he learned of the opening through a listing that stated, *inter alia*, the manager would be charged with the responsibility to *"[e]nsure a safe and secure performance environment."* <u>See</u> **Exhibit 1**, Job Posting, p. 3.

24.     After several rounds of interviews, Plaintiff countersigned the AILEY Offer Letter on August 26, 2021, with an effective start date of September 20, 2021.

**<u>Misclassification and Violations of FLSA and NYLL</u>**

25.     From the outset of his employment with AILEY, Defendant misclassified Plaintiff as an exempt employee within the meaning of the Fair Labor Standards Act ("FLSA") and NYLL ("NYLL"), even though his actual duties did not meet any recognized exemption category.

26.     As Production Stage Manager for Ailey II, Plaintiff reported directly to the Ailey II Company Manager.

27.    Plaintiff's position required him to perform production and stage management duties.

28.    Plaintiff's production duties are non-exempt responsibilities and included but were not limited to reviewing venue technical specifications during the contract approval process with Ailey II's Lighting and Sound Supervisor; advancing all production components with the Technical Director and/or Production Manager of the presenting venues, creation of technical schedules and crew calls for all tours; distributing all necessary paperwork, including technical/production schedules, run times, and local crew calls; supervising Ailey II production staff and local stagehand staff work assignments at performance venues during load in, rehearsals, performances and load outs; creating and coordinating Carnet and cargo delivery schedules with carrier companies for international touring; managing truck logistics for domestic tours; and coordinating and supervising load-in/load-out and truck pack/unpack; supervising and managing the installation and maintenance of marley floor and props.

29.    Plaintiff's stage management duties were non-exempt responsibilities and included but were not limited to creating and maintaining current and accurate cue sheets; calling cues for all performances; preparing rehearsal and costume fittings schedules; working closely with the Artistic Director and Rehearsal Director to create and distribute all rehearsal schedules, programming, and casting sheets; setting up and managing rehearsals; maintaining schedules for studio rehearsals, technical rehearsals, and performances; working with the Artistic Director and Rehearsal Director to coordinate and run yearly auditions; working closely with choreographers and design teams of seasonal new works during initial rehearsal processes to support and develop the work; creating and archiving accurate venue reports; reserving rehearsal and studio space; and ensuring a safe and secure performance environment.

30.     At all relevant times, Plaintiff's job responsibilities were supervised and controlled by Defendant AILEY.

31.     From approximately September 20, 2021 through September 5, 2025, Plaintiff consistently worked far in excess of 40 hours per week performing production and stage management duties for Defendant AILEY.

32.     Plaintiff worked six or seven days per week virtually every week he was employed by AILEY.

33.     During his entire employment, Defendant never afforded Plaintiff a "bona fide meal period," during which he was completely relieved of duty.

34.     Plaintiff perpetually remained "on call" during his meal breaks and never had 30 consecutive uninterrupted minutes to consume food or rest.

35.     During rehearsals and production, Plaintiff discussed work with the Ailey II company Manager; responded to work emails and Teams messages; and took phone calls during his meal breaks.

36.     During performances and tours, Plaintiff worked through most his of his meal breaks or otherwise remained "on call" and performed his job duties while eating.

37.     AILEY was aware of the extensive uncompensated overtime hours worked by Plaintiff and did not act in good faith in misclassifying and paying Plaintiff as if he were an exempt employee under the FLSA.

38.     Defendant failed to pay Plaintiff at the legally required one and one-half times his regular rate for all overtime hours worked.

39.     Under both the FLSA and NYLL, Plaintiff, should have been compensated at a rate of no less than one and one-half times the regular rate of pay for any hours worked in excess of 40

per week.

40.    Plaintiff's work schedule was not a regular Monday to Friday schedule, and the days and hours varied.

41.    A detailed spreadsheet reflecting Plaintiff's conservative documentation of hours actually worked during all work weeks and his unpaid overtime hours is annexed hereto as **Exhibit 2** and is incorporated herein and made part of this Complaint.[2]

42.    From on or about September 20, 2021 through on or about June 30, 2022, Plaintiff was paid $1,250 per week. During this time, Plaintiff worked from 14 to 40 hours of overtime for each week he worked within New York State, for which he was not paid.

43.    By way of example and as more specifically pleaded in the incorporated spreadsheet, from September 20, 2021 through September 26, 2021, Plaintiff worked 20 hours of overtime, for which he was not paid. From March 21, 2022 to March 27, 2022, Plaintiff worked 40 hours of overtime, for which he was not paid. Each week is listed in the annexed spreadsheet. See **Exhibit 2.**

44.    From on or about July 1, 2022 through on or about June 30, 2023, as a result of a "cost of living bump," Plaintiff was paid $ 1,312.50 per week. During this time, Plaintiff's regularly worked overtime hours for which he was not paid, ranging from two hours (February 27, 2023 through March 5, 2023) to 53 hours (from February 13, 2023 through February 19, 2023) per week, as reflected in the annexed spreadsheet. See **Exhibit 2**.

45.    From on or about July 1, 2023 through on or about December 31, 2023, as a result

---

[2] This spreadsheet applies the statute (FLSA or NYLL) that provides the greatest relief to Plaintiff. NYLL, with a six-year statute of limitations, is applied to the time period from September 20, 2021 through November 20, 2022 and only includes hours worked within New York State. The FLSA (three-year statute of limitations period for willful violations) is applied to the time period from November 21, 2022 through August 31, 2025 and excludes hours worked internationally.

of a performance-based raise, Plaintiff was paid $1,500 per week. During this time, Plaintiff regularly worked overtime hours for which he was not paid, ranging from six hours (July 3, 2023 through July 9, 2023) to 38 hours (August 28, 2023 through September 3, 2023) per week, as reflected in the annexed spreadsheet. See **Exhibit 2**.

46.    From on or about January 1, 2024 through on or about June 30, 2024, as a result of a performance-based raise, Plaintiff was paid $1,700 per week. During this time, Plaintiff regularly worked overtime hours for which he was not paid, ranging from six hours (March 11, 2024 through March 17, 2024) to 48 hours (April 8, 2024 through April 14, 2024), as reflected in the annexed spreadsheet. See **Exhibit 2**.

47.    From on or about July 1, 2024 through on or about June 30, 2025, as a result of a "cost of living bump," Plaintiff was paid $1,751 per week. During this time, Plaintiff regularly worked overtime hours for which he was not paid, ranging from four hours (April 28, 2025 through May 4, 2025) to 54 hours (March 24, 2025 through March 30, 2025), as reflected in the annexed spreadsheet. See **Exhibit 2**.

48.    From on or about July 1, 2025 through his termination on or about September 5, 2025, as a result of a performance-based raise, Plaintiff was paid $1,900 per week. During this time, Plaintiff regularly worked overtime hours for which he was not paid, ranging from three hours (June 20, 2025 through July 6, 2025) to 54 hours (August 11, 2025 through August 17, 2025), as reflected in the annexed spreadsheet. See **Exhibit 2**.

49.    In sum, over the course of his employment, Plaintiff accrued a total of approximately 3,933 hours of unpaid overtime, corresponding to approximately $226,775.12 in unpaid overtime wages. See **Exhibit 2**.

50.    Defendant also failed to furnish Plaintiff with required wage notices and accurate

written wage statements during the entirety of his employment. Pursuant to the requirements of the NYLL, as a de facto non-exempt employee entitled to overtime compensation, Plaintiff was entitled to receive, at the time of hiring, a written notice containing, *inter alia*, his regular hourly rate and overtime rate of pay. However, Defendant failed to furnish Plaintiff with required wage notices containing such information at the beginning of his employment and annually thereafter.

51.     Pursuant to the requirements of the NYLL, as a non-exempt employee entitled to overtime compensation, Plaintiff was entitled to receive a statement with every payment of wages, listing, *inter alia*, his regular hourly rate or rates of pay; overtime rate or rates of pay; number of regular hours worked, and number of overtime hours worked. However, Defendant failed to furnish Plaintiff with written wage statements containing such information during the entirety of his employment.

52.     As a non-exempt employee entitled to overtime compensation, Plaintiff's was entitled to receive wage statements regular hourly rate and overtime rate of pay.

53.     Defendants knowingly and willfully operated their business with a policy of not providing proper wage statements as required under the NYLL.

54.     Defendant's failure to provide Plaintiff such information kept him uniformed of his rights, caused him to endure uncertainty regarding his wages, hindered his ability to take action to correct Defendant's wage and hour violations, and deprived Plaintiff of the means to confirm that he was being compensated in accordance with the terms of his employment and with the requirements of federal and state law.

55.     Plaintiff was unaware that he was not being correctly paid; he was not aware of his rights as an employee or what he was entitled to be paid; and he did not know that he was being underpaid.

56.     Had Plaintiff been provided with such information, he would have addressed the issue with Defendant to be timely paid his correct wages. However, Plaintiff lacked the proper information to contest his lack of proper wages.

57.     As a result, Plaintiff was deprived of wages in nearly every pay period, for a longer period of time than he would have been had he been properly informed to address the issue sooner, and he still has not been properly compensated to date.

58.     Additionally, Defendant's failure to provide such information allowed Defendant to report a lower income on Plaintiff's W-2s, thereby reducing the amount of social security benefits to which he would be entitled.

59.     As a result of Defendant's violations in failing to provide wage notices and wage statements, Plaintiff suffered concrete harm.

**Ailey Protocols Relating to Safety in the Workplace and Whistleblower Retaliation**

60.     As part of the onboarding process, AILEY provided Plaintiff with a copy of its Personnel Manual and required as a condition of employment that he familiarize himself with AILEY protocols and requirements. The Personnel Manual was updated in or about September 2022 and provided to Plaintiff and constituted contractual provisions for which both employees such as Plaintiff and the Company were bound to follow. See **Exhibit 3**, Ailey Personnel Manual.[3]

61.     In particular, the Personnel Manual section entitled **"SAFETY IN THE WORKPLACE AND EMERGENCY PROCEDURES,"** indicates:

> *AADF [AILEY] is committed to a workplace that is safe and productive. Accordingly, while on AADF premises, at AADF-sanctioned activities, or during the performance of AADF-related activities outside AADF premises, employees are expected to conduct themselves in a manner that will not endanger themselves, other employees or visitors. Work areas should be kept free of all obstructions that may cause injury to employees or other visitors on*

---

[3] AILEY is referred to as "AADF" in the Personnel Manual.

*the premises. Employees should immediately report any unsafe condition to [his or her] supervisor. Any employee who violates safety standards, cases hazardous or dangerous situations, fails to report, or, where appropriate, remedy such situations may be subject to disciplinary action, up to and including discharge. Additional information and specific emergency procedures can be found and are detailed on AADF's intranet.*

See **Exhibit 3**, p. 24.[4]

62.     Plaintiff was instructed, and the Personnel Manual section entitled "**CODE OF CONDUCT**" indicates, *inter alia*, **"Disregarding safety or security regulations"** is conduct that AILEY **"considers inappropriate and which could lead to disciplinary action up to and including termination of employment."** See **Exhibit 3**, pp. 25-27.

63.     Personnel Manual Section X covers AILEY's full "**WHISTLEBLOWER POLICY**." See **Exhibit 3**, pp. 66-69.

64.     A few of the relevant provisions of the AILEY Whistleblower Policy include:

*SECTION 1: PURPOSE*

*AADF requires its trustees, officers, directors, employees and volunteers (each, a "Protected Person"), to observe high standards of business and personal ethics in the performance of their duties on AADF's behalf. As employees and representatives of AADF, Protected Persons are expected to practice honesty and integrity in fulfilling their responsibilities and are required to comply with all applicable laws and regulations.*

*The objectives of this Whistleblower Policy are to encourage and enable any Protected Person, without fear of retaliation, to raise concerns about an activity that they consider in good faith to be illegal, unethical, fraudulent, dishonest or contrary to AADF's internal policies, so that AADF can address and correct inappropriate conduct and actions.*

*SECTION 4: NO RETALIATION*

*Any Protected Person who engages in the following conduct, regardless of whether such conduct falls within the scope of the Protected Person's job duties, will be protected from retaliatory action:*

*(i) discloses or threatens to disclose to a supervisor or a public body any activity, policy or practice of AADF that the Protected Person reasonably believes is in violation or suspected violation of any law, rule or regulation or*

---

[4] Personal Manual citations cite the page number of the PDF exhibit, not the manual's pagination.

> ***poses a substantial and specific danger to the public health and safety;…or (iii) objects to or refuses to participate in any such activity, policy or practice.***

<u>See</u> **Exhibit 3**, pp. 66, 67-68.

65.     The AILEY Whistleblower Policy ***"prohibits retaliation in any form,"*** defining retaliatory action "***as any adverse action***" to "***discharge, threaten,  penalize, or in any other manner  discriminate against any Protected Person exercising their rights under this Policy***," including ***"discharge, suspension, demotion, or other adverse employment actions"*** and "***actions or threats to take such actions that would adversely impact a Protected Person's current or future employment***." <u>See</u> **Exhibit 3**, p. 68.

66.     As indicated above, the Manual's Safety section requires employees to "***immediately report any unsafe condition to your supervisor***," including while performing AADF-related activities "***outside AADF premises***." <u>See</u> **Exhibit 3**, p. 24.

67.     Given the provision of the Personnel Manual as a centerpiece of his essential position duties and responsibilities, AILEY expected and led Plaintiff to believe that he was required to comply fully with the terms of the Whistleblower Policy and that the Company obligated itself to comply fully with the Whistleblower Policy.

68.     Under clear and unequivocal terms, AILEY was required to not take any adverse or retaliatory action against him if he were to comply with full policy terms and report dangers and safety hazards that he may encounter in the performance of his responsibilities.

69.     Moreover, the Company policy unequivocally indicated that employees such as Plaintiff would be terminated from employment if they failed to comply with such policy.

**<u>The Caribbean Tour</u>**

70.     In or about August 2025, Ailey II embarked on an international Caribbean tour with

performances scheduled in Barbados, Trinidad, and Jamaica. From the outset, the tour did not go smoothly, and Plaintiff was required to troubleshoot circumstances and conditions that jeopardized the welfare, health and safety of Ailey II dancers and crew.

71.     As Production Stage Manager, GUSTAFSON was committed to protecting the dancers and coworkers, and GUSTAFSON put his own welfare and safety on the line for the protection and benefit of the dancers, the AILEY organization, and to complete the performances despite the mounting problems during the tour.

72.     By way of background, as standard practice, Ailey II's Company Manager Sumaya Jackson; Lighting & Sound Supervisor Harrison Hoffert; and Plaintiff had the responsibility to review the overall safety of prospective venues and either approve or express safety concerns and recommend against a venue before AILEY would countersign the performance contracts with the AILEY touring agent, OPUS.

73.     However, for the Caribbean tour, AILEY did not afford Plaintiff, Ms. Jackson, and Mr. Hoffert the opportunity to conduct the due diligence venue review of the specific Caribbean tour venues in advance; and the three stops were added to the AILEY schedule by AILEY's supervisory staff[5] without these three essential Ailey II employees being provided with the critical vetting documentation, including those relevant to safety specifications.

74.     By way of background, for most of the Ailey II touring destinations, Ms. Jackson would customarily receive a letter of interest from OPUS, and she would then reach out to the potential presenter and ask them for "technical specifications," typically a 25- to 50-page document containing all the information about a prospective venue. Ms. Jackson would then send

---

[5] Due to AILEY's lack of transparency, it is unclear who exactly makes that ultimate decision, but upon information and belief, AILEY's Director of Company Business Affairs Isabelle Mezin and/or General Manager Eric Wright are generally involved and called the shots for the Caribbean tour.

those specifications for each venue to Plaintiff and Mr. Hoffert to review. As a matter of course, Mr. Hoffert would then respond to Ms. Jackson, describing any concerns or hesitations regarding a venue. Frequently, however, Mr. Hoffert's raised concerns were ignored and AILEY's supervisory staff would simply add a given venue with raised concerns to the performance schedule without follow-up discussion or investigation.

75.    As a matter of course, the AILEY organization has and continues to customarily disregard raised safety concerns, sacrificing the safety of the hard working and underpaid dancers and workers for monetary profit.

76.    For the Caribbean tour, Plaintiff, Ms. Jackson, and Mr. Hoffert were completely frozen out of the safety vetting process. Plaintiff and his coworkers were aware that, in practice, AILEY would send its dancers anywhere people will pay for them to perform.

77.    AILEY General Manager, Eric Wright, who happened to request an extended presence for the Caribbean tour, had previously overseen AILEY solo dancer performances in the Caribbean, including at Kingston's Little Theater, and had apparently previously approved the venue, including for the August 2025 tour. Neither Mr. Wright, nor anyone else within the AILEY organization who authorized the Little Theater venue, had at any time consulted with Plaintiff, Ms. Jackson, and Mr. Hoffert, none of whom received the required vetting documentation for the Little Theater in advance.

**Plaintiff Troubleshoots Mounting Problems, Including Personal Safety Risks and Problematic Comments of Ailey II's Designated Caribbean Liaison**

78.    The first stop on the Caribbean tour was Barbados, which was marked by a lack of proper technical support and contractual breaches. The local crew provided by the Presenter was grossly inadequate: instead of the seven to eight local workers required by AILEY's technical rider, only one stage manager, an assistant stage manager, and a lead sound and lighting operator

appeared on behalf of the venue, and none of these individuals materially assisted, in breach of the AILEY contract. Only one electrician was available, who was visibly ill, sleeping through much of the day.

79.     Because of these deficiencies in Barbados, Plaintiff was compelled to put himself in danger personally and climbed into the ceiling grid to hang and focus lights - a task beyond his scope of responsibility, but necessary to allow the Company's show to go on and preserve performance quality and the AILEY reputation. Plaintiff went above and beyond, performing additional duties ordinarily assigned to other crew (including changing gels and mopping the stage), due to the understaffing in Barbados. Plaintiff dealt with these issues as a matter of course.

80.     Plaintiff was fully committed to the Company and did not raise safety hazards lightly, nor did he escalate matters unless the safety of the artists/dancers, his AILEY coworkers, or audience members were at risk, and he was required to do so in good conscience and according to his moral, legal, and employment obligations.

81.     The Barbados Presenter further violated AILEY's agreements by failing to provide programs or signage identifying dancers and staff, and by allowing unauthorized filming and photography without coordination with AILEY's marketing teams. The hospitality provisions of the AILEY contract were also ignored: following the performance, no food was available, as hotel and local restaurants were closed, and Plaintiff was concerned that most of the dancers and crew were forced to go to sleep without proper nourishment.

82.     The second stop of the tour was Trinidad, where the local crew was competent and maintained professionalism and continuous coverage through staggered breaks. However, serious logistical failures nonetheless undermined the Trinidad production.

83.     AILEY's equipment, including cargo, carnet items, and road boxes, was held in

customs and remained inaccessible. Although the Caribbean liaison, Plie for the Arts representatives, Presenter Marisa Benain and her partner, Roger Hinds, repeatedly assured AILEY that they could "pull strings" to expedite clearance, no meaningful progress was made. As a result, the equipment was not released in time. Deprived of its light board and essential supplies, AILEY was compelled to make significant compromises to both the artistic and technical quality of the performance, but Plaintiff was able to assure that the health, safety and welfare of the dancers, crew, and audience were not impacted for the performances.[6]

84.    Regarding Trinidad housing arrangements, several members complained that their rooms were rife with mold, but the second company dancers refrained from formal complaints and did not want to escalate the matter and negatively impact their standing and efforts to move up within the AILEY organization into the first company.

85.    In large part because of Plaintiff's loyalty and commitment to the Company, strong work ethic, and professionalism, the performances in Barbados and Trinidad were successfully completed despite the various issues.

86.    The third stop on the tour was Kingston, Jamaica at the Little Theater. Prior to arrival, Production Manager Gregory Simms and Lighting Director Nadia Roxborough of the local Jamaican Plie for the Arts production team forewarned Plaintiff that the venue was challenging and there would be trouble. Specifically, Mr. Simms and Ms. Roxborough called a meeting with Plaintiff to express that if he thought the first two venues were challenging, then he should

---

[6] Plaintiff took other problematic remarks in stride and did not escalate matters when the welfare, safety, and comfort of the dancers was not jeopardized. For instance, Plaintiff observed that Ms. Jackson effectively troubleshooted and protected the dancers during the Trinidad stop when Ms. Benain disparaged the gay dancers and made homophobic remarks, expressing disdain for the male duet in the Ailey II "John 4:20" performance piece. And when Mr. Hinds remarked at a basic security checkpoint to Plaintiff and Mr. Hoffert, "You two white guys look suspicious; they wouldn't have stopped me if you two weren't in the car," Plaintiff saw no need to make a complaint because the dancers and other crew members were not exposed to the problematic remark.

"prepare" himself, because he had "not seen anything yet." Mr. Simms mentioned the heat and encouraged Plaintiff to instruct dancers to bring hotel bath towels to mop up their own sweat. Ms. Roxborough ominously forewarned that the lighting was "out of a history book," and all the lighting instruments were "at least 20 years old."

87.     Upon departure from the Trinidad stop, further breakdowns occurred. Mr. Hoffert, Ailey II's Lighting Supervisor, fell ill after repeated exposure to unsafe and unsanitary working conditions. When Plaintiff proceeded to Kingston, Jamaica with the dancers, immigration personnel questioned missing documentation that the Presenter, Ms. Benain, had failed to provide. Ms. Benain initially instructed the group to falsify entries by claiming their travel was for leisure rather than business, emblematic of her reckless disregard for legal compliance.

88.     These compounding failures culminated in Kingston, Jamaica on August 29, 2025, where Plaintiff discovered and reported multiple health and safety concerns, including but not limited to severe electrical and rigging hazards, triggering the whistleblowing and retaliation sequence further described herein.

**At the Little Theater in Kingston, Jamaica, Significant Dangers are Encountered**

89.     On Friday, August 29, 2025, Plaintiff and the Ailey II team arrived at the Kingston, Jamaica venue, "Little Theater."

90.     Plaintiff and others immediately observed multiple serious safety hazards: the local crew reported undrinkable tap water and rising temperatures; when the light board was powered up, multiple lights flashed with an alarmingly anomalous strobe-like effect, indicating potential electrical hazards; and the space presented precarious and dangerous rigging conditions.

91.     At approximately 9:30 a.m., Plaintiff sent a text message to Ms. Jackson, stating, "This one is really bad," and requesting permission to escalate his concerns to the Company's

General Manager, Mr. Wright, who happened to rejoin the tour again in Kingston, and Director of Company Business Affairs Isabelle Mezin. Ms. Jackson replied that she had no objections to Plaintiff escalating his concerns.[7]

92.     At approximately 9:56 a.m. (JAMT), Plaintiff elevated his concerns and sent the following email to AILEY's management, Ms. Mezin and Mr. Wright, copying Ms. Jackson and Mr. Hoffert:

> Morning. Harrison & I have arrived at the theater. I understand that we have sent dancers here before without incident, but this is NOT a safe venue to be performing in. The rigging is out of control. Visibly fraying rope. Pipes that are bent/caving. The soft goods are layered in dust and potentially harmful substances. There are holes in the deck because of warped and rotting wood. The deck is splintered and unsafe for bare feet. There is rusty metal everywhere. There are staples & nails & screws all over the backstage area. There is exposed wire everywhere you look. There is no air conditioning. There are windows peeking into all the dressing rooms without any way to cover them. The non-existent crew is stumbling around smelling of alcohol after being woken up from the greenhouse next door. There is no filtered water available. This, on top of all the lies that led us to this morning, feel insulting. We need to discuss next steps because I don't know how to guarantee our safety, much less the dancers. Any one of these items in isolation would be problematic, but all together is inflammatory.

See **Exhibit 4**, Emails, pp. 2-3.

93.     Soon after he sent the email to Ms. Mezin and Mr. Wright, Plaintiff received a message from Rehearsal Director Shay Bland, saying that she had received his email. Plaintiff surmised that his email was forwarded to Ms. Bland, but typically, artistic leadership, including Ms. Bland, would not be involved in safety discussions, though as it turned out for the Kingston performances, artistic leadership was heavily involved.

94.     Throughout the day on August 29, 2025, AILEY's managers, including Mr. Wright,

---

[7] Though the dancers reported that Mr. Wright was frequently intoxicated, including at ambassadorial events, a parade in Barbados and an embassy function in Jamaica, given that he was AILEY's General Manager and was physically present in Kingston, Plaintiff endeavored to follow an appropriate chain of command.

and artistic leadership (Ms. Harper and Ms. Bland) visited the venue as Plaintiff and the technical team documented various hazards, and were well aware of the conditions.

95.    For instance, a live electric current was haphazardly encountered despite the venue electrician's steadfast assurances that all power had been cut off, "everything is off and safe," and his earlier agreement to cut the power on dangerously exposed wires and cover the bare outlets, which posed a grave risk of electrocution, serious injury, or death.

96.    In the proper performance of his job duties, Plaintiff continued to disclose his concerns and the lack of compliance with safety measures, country-wide and local building, electric and safety regulations, including the Jamaica Building Code, 2023 and Jamaica Bureau of Standards requirements, to his supervisors, including Mr. Wright, Ms. Harper, and Ms. Bland throughout that day and spent in excess of 12 hours striving and straining to remedy the issues.

97.    At approximately 1:00 p.m. on August 29, 2025, a meeting was held among Plaintiff, Mr. Wright, Ms. Harper, Ms. Bland, Mr. Hoffert, and Mr. Jackson in the hotel lobby. Plaintiff continued to emphasize the potential dangers to personnel and public and the gravity of the situation and the avowed failures of the venue to meet the most basic regulatory requirements.

98.    However, Mr. Wright refused to recognize the importance of the dangers Plaintiff was calling out, and instead solely expressed concerns that if AILEY "pulled out," the Presenter would take away AILEY staff's hotel rooms; AILEY staff would be detained in Jamaica and unable to get on a plane; and the cargo would be held because, as Mr. Wright explained, the presenters "are spiteful".

99.    Plaintiff told Mr. Wright that though he understood his concerns, the solution was not to perform in an unsafe space and expose the dancers, crew, and public to injury or worse. After Plaintiff repeated his concerns and made crystal clear that a solution that assured safety was

of paramount importance and, by necessity, needed to be addressed, the 1:00 p.m. meeting ended abruptly when Ms. Harper pulled Mr. Wright away into a separate private conversation, leaving Plaintiff, Ms. Jackson, and Mr. Hoffert alone without an articulated solution.

100.    At approximately 3:50 p.m. on August 29, 2025, Ms. Benain apologized that the theater was dangerous, but it was all she had to offer.

101.    Among the many safety issues Plaintiff pointed out to supervisory staff, including Mr. Wright, Ms. Bland, Ms. Harper, and Ms. Mezin, were his concerns regarding rigging, the potential for falling objects and grave injury to dancers, crew, and anyone below, including public audience members.

102.    Later, on August 29, 2025, the Little Theater manager admitted the rigging had *never* been inspected, and the theater completely lacked documentation of its structural integrity. Significantly, the Little Theater manager agreed with Plaintiff and acknowledged the danger posed by the rigging and that it was not clear how much weight any of the rigging could safely support without risk of failure. When Plaintiff and Mr. Hoffert asked if AILEY staff could remove some of the more precarious rigging, the theater manager stated it would be "unsafe" to do so (i.e. the precautionary measure would expose the theater's employees to danger). The Little Theater manager also commented that AILEY's rigging and truss was the "most that had ever been used" in his theater, ominously suggesting that it may be pushing the capacity of the theater structures.

103.    Plaintiff's mounting fears, ignored by venue management, Mr. Wright and Ms. Harper, manifested as imminent and serious dangers that were beyond remediation despite Plaintiff's extraordinary efforts. Though Plaintiff worked tirelessly throughout the day on August 29, 2025 to come up with various solutions, his concerns, observations of safety hazards and the corroborating information regarding potential dangers only grew.

104.    Finally, on the evening of August 29, 2025, the night before the first performance, a rigger sourced by Mr. Wright and the Presenter and known to be connected to the installed rigging refused to conduct a final basic safety inspection.

105.    His warnings having fallen on deaf ears, on Saturday, August 30, 2025, at approximately 10:07 a.m., Plaintiff escalated his concerns by email to his supervisors (Mr. Wright), and also alerted AILEY leadership in New York, including Human Resources, General Counsel (Legal), and other higher-level AILEY employees located in New York City, including Ms. Douglas and Mr. Houston, following the Company's whistleblower channel. See **Exhibit 4**, pp. 1-2. AILEY's in-house attorney (Mr. Houston) exclusively acknowledged receipt at approximately 11:29 a.m. See **Exhibit 4**, p. 1.

106.    Despite the escalation and acknowledgment, AILEY, under the direction of Mr. Wright and others, pushed forward with the performances. Defendant drove the dancers to expose themselves to the identified hazards and dangerously overheated venue and ignored Plaintiff's concerns, continuing safety problems, expressed discomfort by the dancers, and depletion and illnesses that followed after the first performance.

107.    As required by law and AILEY contractual obligations, Plaintiff was prohibited from participating in an event that would render him complicit in exposing the dancers, his colleagues, and the public to danger. Accordingly, Plaintiff transmitted the following email up the chain of the AILEY organization and waited for a response, remaining available at a location near the Little Theater, including on August 30, 2025, when he transmitted the email below:

> Despite Artistic & Management's best efforts to address my concerns, assuage my anxieties & mitigate the risks performing in a venue that all parties (including local presenters & production heads) have acknowledged is unfit and will be discontinued following our performance because it does not meet Jamaican safety standards, much less American, I do not feel comfortable co-signing our company performing in this venue, and worse, have been made to

feel expendable in the process.

I refuse to set this dangerous precedent & will not negotiate with terrorists (who have lied to & yelled at us at every opportunity) or cut corners because we are the second company, and thus our lives are somehow worth less than. This would not be allowed in the first company, and this is the clearest sign in my five-year history with the organization that Ailey II should unionize, immediately, because the organization that claims to champion them does not care about or prioritize their safety.

It is a Stage Manager's duty to stand up for the safety of their company, and this charge is infinitely more profound when their flock is the well-being of twelve young, inexperienced, ambitious, inspired artists who lack the agency and protection from retaliation to stand up for themselves, especially from a potential career or life-ending injury.

The about face from the recent terrible Jacob's Pillow incident and the notion that we need to reexamine our safety protocols to this is negligent at worst & cowardice at best. I am disappointed & disenfranchised with the company that I've held in such high esteem for a decade & that made me fall in love with dance when Ailey II visited my college in the middle of nowhere Kentucky and performed Revelations, changing the trajectory of my life.

I am prepared to live with the consequences of my decision, as I hope the organization is prepared to live with the consequences of theirs.

Josh
Production Stage Manager, Ailey II[8]

See **Exhibit 4**, pp. 1-2.

108.    The email was transmitted on Saturday, August 30, 2025, 10:07:21 a.m. (JAMT) to the following AILEY supervisory employees and leadership: Mr. Wright, Mr. Houston, Ms. Douglas, Executive Director Bennett Rink, AAADT Artistic Director Alicia Graf Mack, Chief Financial Officer Pamela Robinson, Ms. Mezin, Director of People and Culture Toronda Miller, Ms. Harper, and Rehearsal Director Shay Bland. He also copied Ms. Jackson, Mr. Hoffert, Ailey II's Wardrobe Supervisor Heather Craig, the first company's Stage Manager HaeJin Han, and the first company's Company Manager Gregory Stuart. See **Exhibit 4**, pp. 1-2.

109.    Plaintiff sent this email early Saturday morning, well in advance of the first evening

---

[8] The full email chain is attached as **Exhibit 4.**

performance scheduled for 7:30 p.m., to provide enough time prior to the performance so that an alternative and safer plan could be effectuated to allow the performance to go forward in an alternative and safer space. By escalating his concerns and looping in other members of the Company early in the day, there was ample time for the Company to collectively work together for the safety of AILEY staff, dancers, and the public. Plaintiff made no effort to cancel the performances and did not abandon his responsibilities. In fact, he was doing everything by the book and in accordance with his duty to prevent a foreseeable catastrophe.

110.    As indicated, only Mr. Houston, AILEY's General Counsel, responded on Saturday, August 30, 2025, at 11:29:24 a.m., New York Eastern Standard Time, stating only, "Received. Thank you." See **Exhibit 4**, p. 1.

111.    Mr. Houston made no further effort to communicate with Plaintiff; he did not call him; he did not respond further with a request for Plaintiff to contact him at any time over the weekend or throughout the duration of the performances, which went forward despite Plaintiff's strenuous efforts to protect AILEY's employees (dancers and staff), the public audience, and any other persons present at the theater.

112.    No one else at AILEY responded to Plaintiff's email, including Mr. Wright, who was physically present in Kingston. Mr. Wright failed to properly and sufficiently protect the dancers, his coworkers, and the public in moving the performances forward despite the dangers.

113.    None of the email recipients made any effort to stop the performances or protect the dancers, AILEY workers, audience members, and others present at the theater. All recipients ignored Plaintiff's safety concerns and failed to make any effort to respond the Plaintiff's email.

114.    Mr. Houston and the other AILEY managers and supervisors on the email thread put profit over safety, ignored Plaintiff's concerns, ignored the seriousness of the safety issues,

and allowed the performances to go forward.

115.    Defendant's decision makers on the email chain, both on site (i.e., Mr. Wright, Ms. Harper, and Ms. Bland) and in New York (Mr. Houston and the others), ignored the dangers, Plaintiff's documented concerns, and the varying statements of some of local representatives and Little Theater personnel that the venue was not safe.

116.    Ailey II, the second or "junior" company, composed of typically younger and less experienced dancers, functioned as the junior or apprentice ensemble. Unlike members of the first company, Ailey II employees lacked union protection and worked under significant pressure to prove themselves in hopes of advancing. Accordingly, Plaintiff acted with appropriate care and vigilance in safeguarding the Ailey II dancers and staff, performance participants and public audiences under his responsibility.

117.    AILEY leadership and decision makers turned a blind eye to the serious nature of the safety hazards as communicated by the Plaintiff and others.

118.    Throughout the day before the first performance, as Plaintiff and others toured and inspected the venue, discussing the problems, other AILEY members diminished the scope and gravity of the situation, proposing inadequate remedies such as having fewer dancers on stage at any one time, for instance. Plaintiff understood neither these AILEY decision makers (Mr. Wright, Ms. Harper, and Ms. Bland), nor any of the dancers, had ever studied technical theater, rigging, or engineering and were not competent to make decisions about these matters. Therefore, Plaintiff believed that Mr. Wright, Ms. Harper, and Ms. Bland were dangerously misleading the dancers into believing they would be safe with fewer of them on stage. This was another reason why Plaintiff believed that he had no choice but to escalate his concerns "above their heads" to AILEY leadership in New York City.

119.     Plaintiff was concerned from the indifference and pushback to his concerns that AILEY would likely continue to minimize or whitewash the matter and retaliate against him; nonetheless, in good conscience, he believed that he had no choice but to proceed and "live with the consequences."

120.     Plaintiff wrote, "This would not be allowed in the first company, and this is the clearest sign in my five-year history with the organization that Ailey II should unionize, immediately, because the organization that claims to champion them does not care about or prioritize their safety." **Exhibit 4**, p 1. By making this strong statement, Plaintiff made clear that he was fulfilling his responsibility for the safety of Ailey II dancers and staff and that he was acting on their behalf in endeavoring to protect them from harm and enable them to have the same rights and protections, as are required by law, that are available to AILEY's first company's dancers and staff. Plaintiff referenced the need for Ailey II to have the same benefits of union protection as the first company.

121.     In fact, and as Plaintiff was aware, there have been previous instances when Ailey II had cancelled performances due to safety concerns. For example, Ailey II cancelled its outdoor performance at Wave Hill in June 2022 because the surface for the performance (grass) was too slippery for the dancers. AILEY also cancelled a performance in Birmingham, Alabama in February 2024 because the ambient temperature (low temperatures) was outside of the designated range for performances.[9]

122.     At the Little Theater, on August 29, 2025, Plaintiff noted that the temperatures *outside* in Kingston, Jamaica had surged to 95 degrees.  Plaintiff also noted that all thermostats

---

[9] AILEY's standard form Contract Rider dictates, "Stage temperature shall not be less than 72 degrees or no more than 82 degrees Fahrenheit from the beginning of load-in to the end of load-out." See **Exhibit 5.**

and temperature recording devices were removed and/or not present inside the Little Theater. Plaintiff and others observed the temperature to be significantly hotter than outside in the un-air-conditioned theater, and they estimated the temperature inside to be in excess of 100 degrees. In addition to the lack of air conditioning, there were no windows. Though some exterior doors had been propped open to create some air flow, the indoor temperature could not be reduced, particularly because the old lights within the theater only added heat, posing a risk that employees, dancers, or the public audience could become ill, faint, or dehydrated.[10] Plaintiff reasonably believed the dancers, engaged in tremendously demanding physical activity, AILEY workers, audience members, and others present at the theater could suffer serious injury in such circumstances, with the temperature far exceeding the temperature range deemed acceptably by AILEY, and could not condone the risk.

123.    In his email, when Plaintiff stated, "It is a Stage Manager's duty to stand up for the safety of their company, and this charge is infinitely more profound when their flock is the well-being of twelve young, inexperienced, ambitious, inspired artists who lack the agency and protection from retaliation to stand up for themselves, especially from a potential career or life-ending injury," he was again making clear that his duty required him to do everything he could to prevent the performances from going forward and to protect the dancers, his colleagues, and the public. See **Exhibit 4**, p. 1.

124.    Plaintiff acted in compliance with his employment obligations and in good faith to steadfastly perform his AILEY responsibilities, fulfill his managerial duties, and protect his coworkers and the public. At no time did Plaintiff indicate in any way that he was abandoning his

---

[10] Plaintiff learned that, later, box fans were brought to the theater; however, these merely pushed around the hot air.

position, resigning, or otherwise refusing to do what he reasonably believed to be fulfilling his most important job responsibilities.

125.    At no time did Plaintiff communicate a "clear and unequivocal intent to quit" his job to anyone at AILEY, and at no time did the Plaintiff absent himself from availability for further communication while refusing to participate in dangerous activity.

126.    Despite Plaintiff's resilience and problem-solving efforts, Plaintiff was required to escalate his concerns and thereafter refuse to participate in the performances, absent reasonable remedies.

**Defendant Retaliates: Plaintiff is Excluded, Issued a Stop Work Order, and Terminated**

127.    Defendant ignored Plaintiff's warnings, went forward with the performances, concealed and lied to the dancers about Plaintiff's absence from the theater, and exposed the dancers, AILEY staff, the audience members, and others present at the theater to grave danger.

128.    Mr. Wright, who was present at the venue, delivered conflicting and destabilizing directives to the dancers regarding safety and insisted that the dancers go forward. Prior to the first performance, Mr. Wright and Ms. Harper lied to the dancers, played off the dangers, and told them that the venue was "safe" because "professionals had checked it out."

129.    However, before the second performance, Mr. Wright and Ms. Harper admitted to the dancers that the venue was "unsafe" and improperly pushed the decision of whether to proceed onto the dancers themselves, essentially pressuring them to show their dedication to the Company and make a management decision involving engineering, electrical, and overall health safety issues clearly beyond the dancers' ken.[11]

---

[11] Ailey II also operates as a training platform, with dancers needing to prove themselves to move up to the first company, Ailey I.

130.    The equivocal position taken by Mr. Wright not only undermined trust but also forced dancers to shoulder responsibility for corporate failures. The dancers were visibly distressed by the request that they decide for their own safety, feeling pressured to deliver the best for job security and their desire to advance to AILEY's first company.

131.    The dancers were confused and divided, and there was no unanimity among them as to what to do. A few, though generally acknowledging the hazards, were willing to risk it and go on with the show, believing this was what the AILEY organization wanted. Others were uncomfortable proceeding but felt as though they had no choice and were outvoted.

132.    Further, during the Ailey II meeting before the second performance, Mr. Wright made the false and nonsensical comment to the dancers that "Josh [Plaintiff] escalated this above my head, so we can't deal with it in-house."

133.    Mr. Wright then ghosted Plaintiff and instructed the other Ailey II team leaders to do the same. Though Ms. Jackson expressed the need to continue communicating with and informing Plaintiff of developments as the weekend performances were to proceed, Mr. Wright, Mr. Houston, and Ms. Douglas told her that she was forbidden to reach out to Plaintiff, falsely representing that Plaintiff was "unreachable." None of these individuals had made any attempt to communicate with Plaintiff, who remained active on Teams and available by phone.

134.    After Plaintiff transmitted his August 30, 2025 email, Mr. Wright and Ms. Harper created multiple group chats with the production team and dancers - deliberately excluding Plaintiff to silence him and keep him uninformed. Ordinarily, Plaintiff would not only have been included in such communications but would have led them. At no time did Plaintiff state to anyone in Ailey II in Kingston that he would cease communication. On the contrary, Plaintiff actively sought solutions to the safety hazards, explored alternative venues until the last minute, and when

faced with outright refusal to adopt viable measures, was compelled to withdraw from efforts that would have rendered him complicit in pushing the performances forward at the Little Theater. Nonetheless, Plaintiff remained nearby, ready, willing and able to work with the team to prevent foreseeable disaster and find safer alternatives.

135.    Mr. Wright was displeased that Plaintiff had escalated safety concerns above him to the New York office. However, Plaintiff did first bring the hazards in the venue and his safety concerns to Mr. Wright's attention, who happened to be along for the tour.

136.    Mr. Wright failed to properly address safety of the dancers, other crew members, others, and audiences, and ultimately made Plaintiff a scapegoat, bitterly suggesting the decision-making was beyond him and the Company since Plaintiff had escalated his concerns to the New York office.

137.    As the Little Theater performances went forward, the dancers and audience members were exposed to dangers, including the haphazard electrical systems, dangerous rigging, potential for falling objects, and excessive heat. Dancers reported feeling on the verge of collapse from the extreme heat in the theater. Members of the audience were also visibly uncomfortable and overheated.

138.    The dancers communicated that "trust in management had been broken." The dancers also stated that they did not feel secure raising safety concerns, fearing retaliation. Their sentiment was explicit, "If Josh can get fired for saying something, then we don't stand a chance."

139.    The dancers have indicated that artistic leadership, including Ms. Harper, and Mr. Wright, when asked directly whether the dancers' safety outweighed "the mission" of the performance, could not provide satisfactory answers.

140.    And in fact, Ms. Jackson previously had conceded to Plaintiff that organizing the

dancers to speak up about safety concerns or not go forward with performances could be perceived by AILEY as a "fire-able offense," resulting in termination, thereby reinforcing the chilling effect on protected disclosures.

141.    Though the Ailey II dancers inquired out of concern for Plaintiff to Mr. Hoffert and Ms. Jackson, it became evident to the dancers that Mr. Hoffert and Ms. Jackson feared for their own positions and were unwilling to stick their necks out and protect the dancers and audience members from exposure to harm.

142.    AILEY's management, including Mr. Wright, HR's Ms. Douglas, and General Counsel Mr. Houston, completely ignored Plaintiff's admonition referencing "the Jacob's Pillow incident" to sound the alarm of potentially dire consequences. **Exhibit 4**, p. 1.  Plaintiff referenced an August 1, 2025 incident, when Kat Sirico, a production manager at Jacob's Pillow, was killed in a workplace accident when known dangers were ignored. The U.S. Occupational Safety and Health Administration ("OSHA") is currently investigating the Sirico death (OSHA Inspection: 1841662.015)

143.    At no time, including in the August 30, 2025 email, did Plaintiff indicate that he was "abandoning" his job. Plaintiff made clear that, under applicable laws, regulations, and AILEY's own binding Personnel Manual and Whistleblower Policy requirements, he was unable to manage, participate in, or allow in any way the performances at the Little Theater to go forward, given the serious and unabated safety concerns and dangers.

144.    In stating, "I do not feel comfortable co-signing our company performing in this venue," Plaintiff made clear that not only was the venue unsuitable and dangerous but that he was doing his job in endeavoring not to expose Ailey II dancers, AILEY workers, the audience, and others present at the theater to danger and AILEY to liability.

145.    During the remainder of the weekend and ongoing AILEY production at Kingston's Little Theater, Plaintiff continued to make himself available and responded immediately when anyone, including concerned coworkers and dancers, reached out to him. He also remained active on AILEY's Teams platform and continued to work on AILEY paperwork, preparing for the fall tour, including scheduling, programming, and casting.

146.    Having been completely frozen out and isolated and not having received any response from Mr. Wright in Kingston or management in New York, Plaintiff felt overwhelmed with stress, could not sleep, and had no alternative but to return to New York on Sunday, August 31, 2025

147.    Plaintiff continued to work on various AILEY matters, including preparing for the domestic fall tour, and archival documentation for the 2025 season's new works, on August 31, 2025, through September 2, 2025.

148.    Then, on Tuesday, September 2, 2025, at approximately 5:24 p.m., without having discussed the matter or Plaintiff's safety concerns further with the Plaintiff, AILEY's HR representative Ms. Douglas issued Plaintiff a "stop-work order for internal review," the first substantive contact since Plaintiff's escalation of Little Theater safety concerns, copying her report Ms. Miller. See **Exhibit 6**, Emails, pp. 2-3.

149.    At no time was Plaintiff consulted regarding his side of the story during the "review." Instead, Defendant summarily fired Plaintiff in retaliation for his having escalated legitimate safety concerns and complying with whistleblower requirements. In a pattern reminiscent of the Cassandra paradigm, Plaintiff's accurate and good faith safety warnings were met not with truth and transparency or honest investigation and dialogue, but instead AILEY engaged in coverup, corrupt dismissal, and GUSTAFSON's wrongful termination.

150.     On Friday, September 5, 2025, AILEY terminated Plaintiff's employment, and later that evening issued a termination letter. During the termination meeting with Ms. Douglas, she asserted that AILEY's reasons were "refusal to perform [his] duties, the unprofessional way in which [he] communicated [his] concerns, and abandoning [his] role mid tour."

151.     Prior to these events, Plaintiff consistently performed well, earning raises, handling high-level projects, and never receiving negative feedback or discipline. Underscoring AILEY leadership's duplicity and the pretextual justification for his termination, the Company has historically declined to terminate other employees who repeatedly failed to report to work, neglected to communicate their whereabouts, and disregarded their duties.

152.     Significantly, in the aftermath of the Caribbean tour and AILEY's retaliatory termination of Plaintiff, AILEY has instructed employees and dancers not to ask any questions about the matter and refrain from further communication with Plaintiff. Defendant refused to allow Plaintiff to collect his personal belongings from the office, despite giving other terminated employees that opportunity. In essence, Defendant has lied to its employees and attempted to tarnish Plaintiff's reputation, telling them that Plaintiff has chosen to leave the Company on his own accord.

153.     To add further insult to injury, AILEY has replaced Plaintiff with an individual who was fired from her previous position with the Paul Taylor Dance Company for making racist comments. In firing Plaintiff and retaining this individual in his place, AILEY has displayed a pattern of negligence and total disregard for the welfare and safety of its predominantly Black staff and dancers.

154.     By virtue of NYLL § 740 and AILEY's Personnel Manual and its Whistleblower Policy, Plaintiff was a "Protected Person" with the responsibility to report hazards and the right to

be free from retaliation; AILEY's policy used mandatory "shall," "will," and "prohibits" language and required acknowledgment within five business days and a prompt investigation by the Board.

155.    Plaintiff had engaged in protected reporting repeatedly - first to management at the venue, and then to HR and Legal per New York State Law and the AILEY Whistleblower Policy - regarding conditions that, among other things, "pose[d] a substantial and specific danger to the public health and safety." Shortly thereafter, when Plaintiff returned to New York, New York, AILEY removed Plaintiff from work and then terminated him.

156.    It is clear from this sequence of events that Plaintiff was fired not for any lawful cause, but in retaliation for his efforts to disclose, objections, and refusal to participate in AILEY's activities, policies, and practices that he reasonably believed were in violation of laws, rules, or regulations and that he reasonably believed posed a substantial and specific danger to the public health or safety, in violation of the NYLL § 740.

157.    In accordance with 29 C.F.R. § 1977.12(b)(2) and OSHA regulations, Plaintiff was required to refuse to participate in the performances having a good-faith and reasonable belief that someone might be seriously injured or worse if the performances went forward at the Little Theater, and he had no other reasonable alternatives but to refuse to participate after he sought correction.

158.    The foregoing facts support claims for retaliation under NYLL § 740, and in the alternative, breach of contract/promissory obligations arising from AILEY's Whistleblower Policy and related mandatory procedures and non-retaliation commitments disseminated in the Personnel Manual.

159.    As a result of Defendant AILEY's retaliatory conduct, Plaintiff has suffered and will continue to suffer substantial economic and non-economic damages.

## JURISDICTION AND VENUE

160.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337 because this action arises under the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq*.

161.     This Court has supplemental jurisdiction over Plaintiff's New York state law claims under the principles of pendent and ancillary jurisdiction, pursuant to 28 U.S.C. § 1367.

162.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) because Defendant maintains its principal place of business within this District; Defendant conducts business in this District; a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District; and Plaintiff was employed by Defendant in this District.

## THE PARTIES

163.     At all relevant times, Plaintiff is and was a resident of the City, State, and County of New York.

164.     Plaintiff was employed by Defendant as a Production Stage Manager for Ailey II from on or about September 20, 2021 until on or about September 5, 2025.

165.     Plaintiff was a covered individual within the meaning of the FLSA and NYLL.

166.     A substantial part of Plaintiff's employment involved job duties where he was engaged in interstate and foreign commerce, performing work involving or related to the movement of persons or things, including but not limited to being responsible for production elements for domestic and international tours, performances, outreach programs, and events for patrons and customers all over the country and the world and regularly working with AILEY staff and dancers for interstate and international productions and performances; making phone calls and transmitting other forms of communication (i.e., mail, emails, text messages, chat messages) to persons located in other States and countries; handling records related to interstate and foreign

productions, performances, tours, and events; and traveling to other States and countries for tours, productions, and performances.

167.    At all relevant times, Plaintiff was a covered employee of Defendant within the meaning of the FLSA and the NYLL.

168.    At all relevant times, Plaintiff was an employee of Defendant AILEY within the meaning of the NYLL § 740.

169.    Defendant is a not-for-profit domestic corporation organized and existing pursuant to the laws of the State of New York, with its principal place of business located at The Joan Weill Center for Dance, 405 West 55th Street, New York, NY 10019.

170.    At all times relevant to this action, Defendant AILEY had the authority to hire and fire Plaintiff, and Plaintiff's employment was subject to Defendant AILEY's direction and control.

171.    At all relevant times, Defendant AILEY is and was an "enterprise engaged in commerce," within the meaning of the FLSA.

172.    Defendant AILEY's officers, managers, and employees are engaged in interstate and foreign commerce, including but not limited to producing, managing, and performing in domestic and international tours, performances, outreach programs, and events for audiences all over the country and the world; engaging in local, interstate, and foreign transactions (processing of credit card transactions for various sales and fees); making phone calls and transmitting other forms of communication (i.e., mail, emails, text messages, chat messages) to persons located in other States and countries; handling records related to interstate and foreign transactions; and traveling to other States and countries for tours, productions, and performances.

173.    Defendant regularly uses and purchases materials from vendors inside and outside of New York and conducts other business with vendors and businesses outside of New York and

the country.

174.    Though a "non-profit" organization, Defendant engages in ordinary commercial activities that result in sales made or business done, including generating revenue from ticket sales for local, interstate, and foreign performances and tours for global audiences; advertising, fees, tuition, and housing costs for its dance school and training programs, which draw students from all over the world; fees for its camps; renting studio space; and other related commercial activities.

175.    Defendant AILEY also is an enterprise engaged in the production of goods for commerce, as it generates revenue from sales of merchandise all over the world, including on its online store.

176.    At all relevant times, throughout the FLSA limitations period, including each year during the three years preceding the commencement of this proceeding, Defendant AILEY's annual gross volume of sales substantially exceeded and continues to exceed far in excess of $500,000.00.

177.    Defendant AILEY currently employs approximately 375 employees.

178.    At all relevant times, Defendant AILEY had hundreds of employees.

179.    Defendant AILEY's high volume of sales and revenue, in the millions, are reflected in IRS Form 990 filings, which are available for public inspection.

180.    At all relevant times, Defendant AILEY was a covered employer within the meaning of the FLSA and NYLL and employed Plaintiff.

At all relevant times, Defendant AILEY was Plaintiff's employer within the meaning of NYLL § 740.

### AS AND FOR A FIRST CLAIM FOR VIOLATION OF THE OVERTIME
### PROVISIONS OF THE FAIR LABOR STANDARDS ACT ("FLSA")

181.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

182.    At all relevant times, Plaintiff was an "employee," and Defendant was an "employer" within the meaning of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 203(e) and 203(d).

183.    Defendant had the power to hire and fire Plaintiff, controlled the terms and conditions of his employment, and determined the rate and method of any compensation in exchange for his employment.

184.    At all relevant times, Defendant was and is an enterprise engaged in commerce or in the production of goods for commerce within the meaning of 29 U.S.C. § 203(r-s).

185.    Defendant was and is subject to the overtime pay requirements of the FLSA because said Defendant is an enterprise engaged in commerce or in the production of goods for commerce.

186.    The gross annual volume of sales made or business done by Defendant for years 2022, 2023, 2024, and 2025 was not less than $500,000.

187.    At all relevant times, Defendant had and continues to have employees engaged in commerce or in the production of goods for commerce, or that has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person.

188.    At all relevant times, Plaintiff was entitled to the rights, benefits, and protections granted by the FLSA, 29 U.S.C. § 207, *et seq*.

189.    Defendant misclassified Plaintiff as exempt from the FLSA's overtime requirements and failed to pay Plaintiff one and one-half times his regular rate of pay for hours

worked in excess of 40 per week.

190.    As a result of this misclassification, Plaintiff routinely worked in excess of 40 hours per week without proper overtime compensation.

191.    By the above alleged conduct, Defendant violated the FLSA by failing to pay Plaintiff overtime compensation as required by the FLSA.

192.    None of the categories of employees exempted from overtime compensation requirements set forth in 29 U.S.C. § 213 apply to Plaintiff because he did not meet the requirements for coverage under the exemptions.

193.    Defendant acted willfully and either knew that their conduct violated the FLSA or showed reckless disregard for the matter of whether their conduct violated the FLSA.

194.    Defendant did not act in good faith with respect to the conduct alleged herein.

195.    As a result of Defendant's violations of the FLSA, Plaintiff has incurred harm and loss in an amount to be determined at trial, along with liquidated damages, attorneys' fees, and costs of litigation, pursuant to 29 U.S.C. § 216(b).

**AS AND FOR A SECOND CLAIM FOR VIOLATION OF THE
OVERTIME PROVISIONS OF THE NEW YORK LABOR LAW ("NYLL")**

196.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

197.    At all relevant times, Plaintiff was an employee, and Defendant was an employer within the meaning of the New York Labor Law ("NYLL"), §§ 190, 651(5), and 652.

198.    Defendant failed to pay Plaintiff overtime compensation at one and one-half times his regular rate of pay for hours worked in excess of 40 per week, in the manner and methods provided by the FLSA in violation of 12 N.Y.C.R.R. § 142-2.2.

199.    By the above alleged conduct, Defendant failed to pay Plaintiff overtime

compensation as required by the NYLL.

200. By the above alleged conduct, Defendant failed to pay Plaintiff overtime compensation for the time periods in which he worked in excess of 40 hours per week for Defendant.

201. Plaintiff is not exempt from the overtime provisions of the NYLL because he has not met the requirements for any of the exemptions available under New York law.

202. Defendant acted willfully and either knew that its conduct violated the NYLL or showed a reckless disregard for the matter of whether its conduct violated the NYLL.

203. Defendant did not act in good faith with respect to the conduct alleged herein.

204. Defendant's failure to pay Plaintiff overtime compensation was willful within the meaning of NYLL § 663.

205. As a result of Defendant's violations of the NYLL, Plaintiff incurred harm and loss in an amount to be determined at trial, along with liquidated damages, attorneys' fees, and costs of litigation, pursuant to the NYLL.

**AS AND FOR A THIRD CLAIM FOR VIOLATION OF THE NOTICE AND RECORD-KEEPING REQUIREMENTS OF THE NEW YORK LABOR LAW**

206. Plaintiff repeats and realleges each and every allegation in the preceding paragraphs as if more fully set forth herein.

207. Defendants willfully failed to furnish Plaintiff with wage notices during the entirety of his employment, including the date of his hiring, as required by NYLL § 195(1), in English or in the language identified by Plaintiff as his primary language, which were to contain, among other things, Plaintiff's rate or rates of pay and basis thereof; whether paid by the hour, shift, day, week, salary, piece commission, or other; the name of the employer; any "doing business as" names used by the employer; the physical address of the employer's main office or principal place of business,

and a mailing address if different; the telephone number of the employer; and Plaintiff's regular hourly rate of pay and overtime rate of pay.

208.    Through their knowing and intentional failure to provide Plaintiff with the wage notices required by the NYLL, Defendants have willfully violated NYLL §§ 190, *et seq*. and the supporting NYLL.

209.    As a result, Plaintiff suffered concrete harm.

210.    Due to Defendants' willful violations of the NYLL, Plaintiff is entitled to recover statutory penalties in the amount of $5,000, together with costs and attorneys' fees provided by NYLL § 198 (1-b).

## AS AND FOR A FOURTH CLAIM FOR VIOLATION OF THE
## WAGE STATEMENT PROVISIONS OF THE NEW YORK LABOR LAW

211.    Plaintiff repeats and realleges each and every allegation in the preceding paragraphs as if more fully set forth herein.

212.    Defendants willfully failed to provide Plaintiff written wage statements with his wages each week as required by NYLL § 195(3), which were to include, among other things, the dates of work covered by each payment of wages; name of employee; name of employer; address and phone number of employer; rate or rates of pay and basis thereof; whether paid by the hour, shift, day, week, salary, piece, commission, or other; gross wages; deductions; net wages; the regular hourly rate or rates of pay; the overtime rate or rates of pay; and the number of regular hours worked and the number of overtime hours worked.

213.    Through their knowing and intentional failure to provide Plaintiff with wage statements required by the NYLL, Defendants have willfully violated NYLL § 190, *et seq*. and the supporting NYLL.

214.    As a result, Plaintiff suffered concrete harm.

215.    Due to Defendants' willful violations of the NYLL, Plaintiff is entitled to recover statutory penalties in the amount of $5,000, together with costs and attorneys' fees, as provided by NYLL § 198(1-d).

**AS AND FOR A FIFTH CLAIM OF WHISTLEBLOWER**
**RETALIATION IN VIOLATION OF NEW YORK LABOR LAW §740**

216.    Plaintiff repeats and realleges each and every allegation in the preceding paragraphs as if more fully set forth herein.

217.    Plaintiff was an employee within the meaning of NYLL §740.

218.    Defendant AILEY is and was an employer within the meaning of NYLL §740.

219.    Defendant violated NYLL §740 by excluding, issuing a stop work order to, and then terminating Plaintiff because of his numerous disclosures and reports to his supervisors, objections to, complaints about, and refusal to participate in Defendant's failure to remedy dangerous conditions and ensure a reasonably safe performance space for AILEY's employees (dancers and staff), audience, public, and others present at the Little Theater.

220.    The complained-of and objected-to practices, procedures, actions, and/or failures to act by Defendant AILEY not only violated safety standards in Jamaica and New York but also violated AILEY's own internal policies and practices, which Defendant made binding upon Plaintiff.

221.    The complained-of and objected-to practices, procedures, actions, and/or failures to act by Defendant posed a substantial and specific danger to public health or safety.

222.    Particularly, Plaintiff has a good faith reason to believe, and reasonably did believe, that Defendant AILEY's actions were in violation of a law, rule, or regulation and posed a substantial and specific danger to the public health or safety.

223.    Plaintiff reasonably believed that the disclosed, complained-of, and objected-to practices, procedures, actions, and/or failures to act by Defendant violated laws, rules, and regulations and applicable codes of New York State and Jamaica, West Indies and they put other AILEY employees, Plaintiff, and the public in danger – and they did.

224.    Plaintiff disclosed and reported, objected to, and refused to participate in a policy or practice of his employer that he reasonably believed was in violation of a law, rule, or regulation and posed a substantial and specific danger to the public health or safety.

225.    Defendant took retaliatory action against Plaintiff by terminating him, in violation of NYLL §740.

226.    Defendant took this action in a willful, malicious, and wanton manner.

227.    As a result of Defendant AILEY's retaliatory conduct, Plaintiff has suffered and will continue to suffer substantial economic and non-economic damages.

228.    Pursuant to NYLL §740, Plaintiff is entitled to compensation for lost wages, benefits, and other remuneration and the payment by Defendant of reasonable costs, disbursements, and attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court enter judgment against Defendant by:

    a.  Declaring that Defendant committed one or more of the following acts:

        a.  Violated the FLSA by failing to pay overtime wages to Plaintiff;

        b.  Willfully violated overtime provisions of the FLSA;

        c.  Violated overtime provisions of the NYLL by failing to pay overtime wages to Plaintiff;

        d.  Willfully violated the overtime wage provisions of the NYLL;

  e. Violated the acts, policies, and practices of NYLL §740;

  f. Willfully, maliciously, or wantonly violated the acts, policies, and practices of NYLL §740;

b. Enjoining and permanently restraining these violations;

c. Directing Defendant to take such affirmative steps as are necessary to ensure that the effects of these unlawful practices are eliminated;

d. Awarding compensatory damages, including all overtime compensation owed, in an amount according to proof;

e. Awarding liquidated damages under the FLSA and NYLL;

f. Awarding statutory damages for violations of NYLL § 195(1);

g. Awarding statutory damages for violations of NYLL § 193(3);

h. Directing Defendant to make Plaintiff whole for all earnings and other amounts or benefits he would have received but for Defendant's retaliatory and unlawful conduct, including but not limited to wages and other lost benefits;

i. Directing Defendant to reinstate Plaintiff to the same position held before the retaliation action, or to an equivalent position, or front pay in lieu thereof;

j. Directing Defendant to reinstate Plaintiff's full fringe benefits and seniority rights;

k. Awarding Plaintiff damages to compensate Plaintiff for all monetary and economic damages;

l. Awarding Plaintiff damages to compensate Plaintiff for all non-monetary, non-economic, and/or compensatory damages, including but not limited to compensation for emotional distress;

m. Directing Defendant to pay Plaintiff punitive damages pursuant to NYLL §740(5)(g).

n. Awarding Plaintiff such interest as is allowed by law, including prejudgment and post judgment interest;

o. Awarding Plaintiff reasonable attorney's fees and costs; and

p.  Granting Plaintiff such other and further relief as the Court deems necessary and proper.

Dated: New York, New York
            November 20, 2025

GIORDANO LAW OFFICES, PLLC
*Attorneys for Plaintiff*

By: _____
Carmen Jack Giordano
226 Lenox Avenue
New York, NY 10027
Phone: 212-406-9466

## VERIFICATION

STATE OF NEW YORK      )
                       ) ss:
COUNTY OF NEW YORK  )

     JOSHUA GUSTAFSON, being duly sworn, under the penalty of perjury, deposes and says:

     I am the Plaintiff in the within Complaint. I have read the foregoing Complaint and know the contents thereof. The allegations of the Complaint are true to my own knowledge, except as to such matters which are stated to be alleged upon information and belief, and as to those matters, I believe them to be true.

 

 

_____
JOSHUA GUSTAFSON

 

 

Sworn to before me on this

_20th_ day of _November, 2025_

 

_____
Notary Public

STEFANIE BEHLER SORIANO
Notary Public, State of New York
Registration #02SO6313944
Qualified In New York County
Commission Expires 10/27/26